May I please the court? My name is Don Cox and I represent the appellants, Sherry Huff and Midwest Merger Management, and I would like to reserve five minutes of my time. I'm not going to deal with all the issues we raised in the brief, which were extensive. I'd like to deal with three or four key issues, though, that I think inform a decision in this case. I want to first focus on instruction number 30, which was based upon the Violent Crime Control and Enforcement Act of 1994. That instruction has to... Participating in the business of insurance, right? Yes, ma'am. Instruction number 30. Yes, ma'am. The standard for instructions is they must fairly and adequately cover the issues presented, correctly state the law, and not be misleading. And they must be tied to a claim brought in the lawsuit. There is no claim in this lawsuit which was brought under the Violent Crime and Enforcement Act of 1994. This instruction leads us nowhere. It leads to no verdict form for the jury to fill out. It's simply sitting there, and it is a huge red flag for us. Okay, but didn't the instruction provide a basis for finding the unlawful conduct necessary to support Cridler's civil conspiracy claim? No. It's no basis at all. The instruction simply said if you engage in the business of insurance and you're a felon, you can't do that. It didn't provide a basis for recovery. In fact, Judge Lasnik in Thompson v. Washington held there was no private right of action whatsoever under the Violent Crime Control Act. Now, what they argued, what Cridler argues, is that, well, this thing establishes the public interest. That's what they argued in the brief. And they already had a summary judgment that the public interest was already implicated for purposes of the Consumer Protection Act. This morning I went back and read the closing argument of Mr. Cridler, and there they argued twice that the reason why this instruction, instruction number 30, was important was because of the Form A that was supposed to be filed by Huff, and Huff wouldn't file a Form A. But at the time, the chronology has gotten all scrambled up here. When this program was entered into in February, Huff had no conviction of a crime. Well, let me ask you, so, well, all right, but wouldn't the jury have known anyway about Cridler's prior convictions? You mean Huff? Oh, I'm sorry, yes. With or without this instruction. So what would be the harm? Well, but the instruction, yes, they knew because it went to the issue of credibility and impeachment with the conviction of a crime. But then you take it further and you say it's against the law for a person with a felony to engage in the business of insurance or become a broker, and then you don't ask the jury, well, did Mr. Huff engage in the business of insurance? Was he a broker? It's just sitting out there. I just don't see how, you know, I just don't see how you can piece it out, because it's all part of a bigger picture in terms of to understand exactly what these people were doing. And if you're looking at a conspiracy, that, you know, it's, I mean, really so much of why they were doing what they were doing is because the men here have their legal problems and they've been involved in a number of scams otherwise, which they're convicted of at certain points. So then they put the women there, and then they have all these structured payments as far as, you know, I can understand why you would want to sanitize it, but it's really part of the conspiracy. But it doesn't lead anywhere. The problem with the instruction is where do I argue to the jury that Huff didn't engage in the business? Isn't it relevant to, you know, the conspiracy finding? In other words, it could be a conspiracy, you know, to unlawfully conduct a business of insurance, right? By having someone who is not qualified participate. Isn't that, couldn't that sustain a conspiracy charge? Yeah, because if he were qualified, then he wouldn't have needed to have done all the other things that he did. But the fact that he's not, that's why he needs to set it up the way that it is. Well, but you use the word set it up, and that's where the chronology comes in. When this was set up in February of 04, there was no felony conviction. The whole program was put in place before Huff got his felony conviction. The whole conspiracy, if you will, was effectuated by entering into this program, according to them. And the program was in place, everything was moving along, and then he gets the felony conviction. So where's the conspiracy? Where's the conspiracy to enter into this program? You listen to Mr. Kreidler, and he says, he admits that Ference found out about Huff's problems in one week after the program began, third week of February. And he says, we couldn't do anything about it then, because we had already entered into the program. Well, by the time he got the felony conviction, a couple of months later, if you buy their argument, he was already in the program. So this wasn't part of the conspiracy. The timing is off. And coming into the case, I got to try the issues, the claims in the complaint. And that's what we did. And one of the claims in the complaint was not this Violent Crime Control Act. There was no claim in there about engaging in the business of insurance, and what's the business of insurance, as is in that instruction, or being a broker. We didn't have to put on any evidence about that, because that wasn't an issue. And then the instructions come out. All the proof's in, and I'm dead. There's nothing I can do. I'd like to move on to the... Well, part of the problem in this case is the facts are really, you know, quite bad for you. I mean, sadly. I mean, sometimes you take the cases as, you know, I mean, lawyers are lawyers. They're not magicians. And the facts here are really quite negative for you. Well, I like to think I'm a magician, but the facts, there were problems with the facts. There's no question about it. Well, I'm saying that for the benefit of that. I think that you are a magical counsel, but these are, you were handed some pretty bad facts here. And that, you know, I think Kreidler's biggest problem was the accounting wasn't as great as it could have been. However, the fact that there were so many transactions and that there was so much money that they ended up owing that it makes it very difficult to overcome. Well, let me comment on several of the things you said about you. A couple of minutes ago, you mentioned that Mrs. Huff let her former husband run the business, and then somehow that was a violation of something. You know, silent partners have been recognized in the business world for decades and decades. Under Washington's LLC law, under Kentucky's LLC law, the mere ownership of an LLC doesn't make the owner responsible for what the LLC does. This is like a Ponzi scheme. I mean, the only, I mean, the worst of it is that, you know, I was trying to figure out here in terms of I guess who ends up, I guess maybe the state ends up with losing all the money. But if this is like we're Bernie Madoff and all these individuals were losing the money, I mean, it's just a glorified Ponzi scheme. Well, I don't agree that it's a glorified Ponzi scheme, but I think we need to focus on Mrs. Huff and the evidence against her, and the evidence against her is that she was not involved. She's convicted. They found against her on the conspiracy claim, and under Washington law it's quite clear that there has to be an agreement between the parties as to the item of the conspiracy, as to what they're conspiring for. There's no proof of that. The proof of it. Well, what did they do with all the money, with all those checks that every day and then went home, went and put money in a safe? Millions of dollars. I mean, she was involved in all of that. She got money out of her company. $7,000 every day? Well, no, she didn't get that money. The evidence was that Mr. Huff got the money. There was evidence that Ms. Huff got some tens of thousands of dollars out of the company, but it's her company, and, you know, you said there's a problem with the damages because they couldn't prove anything. Well, you're darn right. There was $122 million that went through this company, and where's the proof that money meant for Cascade went into Ms. Huff's pocket? There isn't any proof. And, you know, you combine that with the conflicting verdict where under one of the verdicts they found her guilty of theft of premiums and then under the other one they found her not guilty. There's no explanation for that. The only explanation that the trial court had was, well, it must have been different money. But there's no evidence to support which money we're talking about, which money was she not found guilty on and then which other money was she found guilty on. The evidence just doesn't support it. And I know the facts are not helpful in this case, but the problem that we run into in this case is you have to look at this on a person-by-person, claim-by-claim basis, and that didn't happen with respect to Ms. Huff. What happened was when you boil the evidence down, the evidence was, well, Mr. Huff told her he'd take care of her for the rest of her life. Well, I don't think that proves a conspiracy. That may prove that he's paying her some form of alimony or that he's guilty about getting a divorce, but it doesn't prove conspiracy or violation of the Consumer Protection Act. Likewise, the fact there's a power of attorney that she granted to him at a time when she was very sick also doesn't prove a conspiracy. As I said before, under the LLC Acts, an owner of an LLC is entitled to have other people run the company for him or her, and they're not responsible for the fact that they're a member. I want to deal briefly with the third-party beneficiary claim against a Midwest merger manager. Well, correct me if I'm wrong on that. At first you won on that issue at summary judgment. Well, right, I won the summary judgment. It still was not a dead issue at that point. All right, but then the court reversed that at the time of trial and sent it to the jury, right? No, that's not quite correct. They moved for summary judgment and the judge denied it, so it's still up in the air at that point. But in denying it, the judge did what we thought was an excellent analysis of New York law, and if you read his opinion, it seemed to say that he didn't think there was a claim for third-party beneficiary because the element is the intention of the parties and the various factors that he went through, whereas the agreement had been executed a couple of years before, Cascade's not mentioned in the agreement. In fact, the agreement says it's only for the benefit of the parties and their assigns and so forth. And then when it came to trial, he put the issue to the jury in an instruction and asked the jury to make a finding of whether there was a third-party beneficiary. And under New York and Washington law, the question of whether a party is a third-party beneficiary of a contract is a question of law unless the third-party language is ambiguous, and it wasn't ambiguous. So that's a question of law, and we submit that the law is quite clear that there is no third-party beneficiary of this agreement. Well, Judge Laszlo did change his mind as to whether it was a question of fact or a question of law, right? I don't believe he did, in fairness to him. I believe he simply denied summary judgment, which as I understand it simply means everything's still in play. Well, but if it's a matter of law, someone entitled to judgment, that's when you grant summary judgment. If you deny summary judgment, you say that there's a triable issue of material fact. Well, but they moved for it. The plaintiff moved for it, and he told them they weren't entitled to it, and then he cites New York law. Because there was a triable issue. Well, I don't think he really said there was. If it went to the jury. He believed there was a triable issue. I'm not arguing with you about this. I mean, it looked to me like he changed his mind, but in fairness to him, I can't say that because it was only a denial of their summary judgment, not a grant of our summary judgment. I'm not arguing with you about that. Other things, but not that one. Finally, I want to talk about damages very quickly. There was no evidence. There was tens of millions of dollars that went through this company. They put on this guy named Sudfin, who comes in and testifies under oath, that he can't tell where the money went. Well, he can't tell where it went. He just knows it didn't go to Cascade, right? Well, but the issue is not. I mean, he can show it came in, and he can show that Cascade didn't get it. But he doesn't know how much came in. The only evidence on the money coming in was Exhibit 100, and that was an accrual income statement from Certified, and Sudfin admitted it was accrual. And if you have an accrual statement, that doesn't prove the money comes in or goes out. All that proves is that it's owed. The company was owed by its customers money for insurance, and it, in turn, owed the money to Midwest. That's no proof that the Cascade money was diverted, and that's the problem. We don't know that the money ever got to Midwest. There's no proof that Cascade's money got to Midwest. The only proof is that Cascade didn't get all the money it was claiming, not that Midwest ever got it. And I see I'm down to four minutes. All right, so you can reserve that. Thank you. Good morning. Good morning. May it please the Court, Victoria Vreeland for the Plaintiff, Kreidler, Insurance Commissioner for the State of Washington. Let me first address Jury Instruction Number 30. Counsel makes a great error by stating that there was no conviction of the crime at the time this program went into place, in February of 2004. They also state that in their opening brief. SER 141 are the documents on the charge, the sentencing, and the plea. The charge was in 2000. The guilty plea was May 2003. Cascade was never even contacted by anyone from the Huff Group until the fall of 2003. So the guilty plea was already in. I think a guilty plea is a conviction. And then the sentencing was not until May of 2004. So counsel's made a grave error by saying there was no conviction at the time of this program in February of 2004. Jury Instruction 30 is counsel argues that it has to be tied to a claim. It was tied to a claim. We had no claim based on Title 18, but the instruction and the information was tied to several of our claims. One being unfair deceptive trade practice. Another being the conspiracy. Another being the fraud and failure to disclose. Well, wouldn't the jury have known about his prior conviction with or without the instruction? Wouldn't that have come out? Yes. In fact, the conviction came in. There was an instruction on using the conviction for credibility and also to use it for proof of motive, opportunity, et cetera. But in order to say that, in order to argue that it's an unfair deceptive practice or that it is wrongful or unlawful manner to have Huff involved, there has to be an instruction on the law telling the jury, why is it wrongful not to disclose Huff? Because you don't usually have to disclose all the people in the background. But when you have a convicted felon on a breach of trust or dishonesty, it is unlawful to let them participate in the business of insurance. That's the linchpin that makes it wrongful and harmful and deceptive. And the whole reason that these parties put up this elaborate scam to conceal and deceive not only buyers, not only Cascade, not only different folks and certified, but also the regulators at the State of Washington. Just so that I understand this, who's ultimately out the money here? Cascade went into receivership. It is, by law, has to go out and marshal all the assets. The workers' comp program was all in California. So the California Insurance Guarantee Fund steps forward to continue covering the claims for the workers. So the workers get their claims covered because they paid their premiums or the employer paid the premiums, you know, whatever, their premiums were paid. And the minute Cascade provided the insurance, the workers were entitled to coverage whether Huff's group ever paid it or not. But after receivership, the setup is to make sure that the claims continue to be paid and they are still being paid to this day. This California Insurance Guarantee Association has a top-priority claim against the assets of the Cascade receivership. And so Cascade continues to garner its assets, to bring claims such as this, to get the money to give first to a cost of administration like in bankruptcy, and then next to the California Insurance Guarantee Association to repay them for all the claims they've paid. Now the guarantee associations exist in every state, and they are funded by insurers. Part of our premiums of our insurance policies go to fund the guarantees, guarantee associations. So the guarantee association can't go out and sue. Only Cascade, as the receivership estate, can do that. So Cascade, the problem that comes about to them because they don't get the money, is that they end up, their business goes down and they're in receivership. Well, they may have gone down anyway. We are not asking, never ask the court or the jury for damages for the failure or collapse of Cascade. We strictly limited it to what money was not paid for the workers' comp policy. And that ties into the counsel's argument about damages. We didn't simply say the money that the employers and ASRC passed on to Midwest through Cascade, that isn't the end of our damages. That is one of the claims for misappropriation of premium. The damages here for unfair and deceptive acts, conspiracy, fraud, negligent representation, are the value. They got everything that we promised, and Cascade was not paid. So it is far beyond the mere diversion of funds. And did the jury come back in their verdict in terms of damages with exactly what the expert that you called said the damages were? Well, the expert was not testifying on damages. He was testifying about how the funds went from ASRC to Midwest and what happened to the money from what he could tell. The jury came back and said for negligent... This is a complicated case, so I'm curious where their numbers came from. The $19,310,000, that's the total amount due and owing under the policy for all the workers' compensation. But who presented that evidence? Pardon? Is that what the attorney argued to the jury, or how did their numbers, what did we track their numbers to? The $19 million is based on the testimony of lay morale, which is all based on the policy claims, the deductible premium, the self-reported premium, all the types of things that are covered in this policy. The $19 million is the total that was due and not paid. The Huff Group paid about $8 million, but there was still another $19 million owing. That was lay morale's testimony. It was supported by Charles McClanahan, who was the actuarial expert. There was no significant evidence to dispute that. With respect to the misappropriation of insurance premium claim, that amount was $3,348,000, and that was found against everyone except Sherry Huff. That amount is listed as part of the $19 million. It's called the deductible premium. And the same amount was for the third-party breach. That was $800,000. No, that was $3 million. The criminal profiteering was the $820,000. Here's how we argued it and what I believe the jury came up with. The misappropriation of premium from the employees to ASRC and into Midwest. The jury found that that amount, and they found that against Anthony Huff, Dan Pixler, and Midwest, because they took that money. And the jury said, well, at least on the chart of all these items that are due, we see that the $3,348,000 is called a deductible premium. So we know that amount is due. The ASRC group passed at least $14 million over to Midwest. So that's the first misappropriation of premium. The second step is when Sherry Huff and Anthony Huff take that money out of Midwest, and that's what we have trouble tracking because they commingled all the money in one account. Their QuickBooks were a disaster and were even revised years after the fact. So the jury looked at a number of things that we presented, including $637,000 taken out of Midwest for Huff Farms, charges, lots of different charges for personal things for Mrs. Huff. I've gone through all the bits and pieces to try to see where they came up with the $820,900. I think that it's there. You can pull a piece here and a piece there. So you didn't argue that the attorney didn't argue the exact numbers. They came up with their own numbers, or are those the exact numbers the attorney argued? I argued the exact numbers for negligent misrepresentation, fraud, civil conspiracy, and consumer protection. We also argued for criminal profiteering that they're responsible for all of it because they put it in a pot, mixed it up, and said, ah-ha-ha, you can't tell what's ours and what's not. The jury didn't buy that. So your number was your $820, or that number was not your number. That was their number that they went through. That's what the jury found out of the umbrella of numbers. That's how the jury came up with the number. We proved more than that, so I don't know if they added up things, if they negotiated a figure or what. For the misappropriation of premium, we argued the full $19 million because under the policy and under the law, the whole amount due is technically the premium. We didn't get that instruction. And so the jury came up with what was listed as deductible premium because I think most people think the premium being the amount that you pay up front for the policy. But that is analysis. You have a cross appeal, but it's primarily protective if the court does not affirm. Absolutely, it is judgment. But they do claim that there was an inconsistency in the jury verdict. What's your response to that? Again, the misappropriation claim is of insurance premium. The civil conspiracy claim is premised on theft, and this is against Sherry Huff. Theft is and was defined as under color or aid of deception, a person takes controller or exerts authority over the property of another. The district court has the obligation, of course, to look at that for consistency and coherency and found that it was because we have two different claims. One conspiracy is the Pixler Huff Midwest to get all the money out of the employer group into Midwest. The second conspiracy is Sherry Huff agreeing to do all these things. I'll sign everything you want. I've lived with you 17 years. She never was on the paperwork until after the charge and conviction. So the second conspiracy is their agreement that she will sign and be the front person for him. So there was at least $3.348 million in deductible premium that wasn't passed over to Cascade. There was more than that, but the jury latched on to that deductible premium. There was more money, there was a ton of money in the Midwest accounts that Sherry Huff used willy-nilly however she wanted. It's not inconsistent to say that she didn't steal. We did not argue that Sherry Huff thieved or stole the money from the employees into Midwest. We argued that Sherry Huff set up, assisted in a capacity to deceive, in an unlawful purpose scheme, and that once the money got to Midwest, she just used whatever she wanted without regard to whose money it was. And that's where it's different. The misappropriation claim is a lot narrower than the conspiracy theft claims. And I think it's an abuse of discretion standard, and the district court reviewed it, was there, saw the evidence, and said it can be reconciled and it can be coherently resolved. The third-party beneficiary claim, we moved for summary judgment. It was denied. It was unclear. So we moved for reconsideration to make sure that we understood what the rule was. And the court ordered that we could still argue that at trial. And so we put on the agreement. We put on Tom Cunningham and Mr. Russo, who described how the agreement operated. And then the defendant testified and testified that the agreement, to his understanding, meant different things. In my brief, I said page 118, or I think it starts on 118 and goes to 119, and I may have left that page number out. But Mr. Huff was able to testify over my objection on parole evidence to his understanding of the agreement, that Midwest simply assisted, that Midwest just helped, and the agreement says something different. So sending that to the jury was not error. And even if it was, Judge Lasnik reviewed it and said he would have ruled the same way. I think I've addressed damages. I do want to address the civil conspiracy facts with regard to Mrs. Huff, because I think that's the bulk of their argument in their appeal. It's not just the civil conspiracy, but consumer protection and the criminal profiteering. Each claim has to be looked at separately. When you look at the evidence against Mrs. Huff, she has an accounting degree. She worked in the insurance industry. She was licensed as an insurance agent. They lived together for 17 years. His license was revoked for misappropriation of premium. He was charged in 2000 with all these counts of mail fraud arising from premium abuse. It wasn't until 2001, when they set up Midwest, that her name then appears as the owner. She was in the Midwest office helping from time to time. She signed everything and anything he wanted. She would get a call from Michelle Brown about a document and would just say, just sign it. She did exactly what he wanted. The safe was in their home, $2.7 million coming in and out of that safe. She directed the expenditure of money from Midwest. Luckily, there was one piece of evidence, ER 259, with her handwriting to Michelle Brown, telling her what personal loans or obligations of the family to pay out of Midwest money. And the accountant, Anthony Russo, for Midwest and certified, testified that all the Huff family money was channeled to Sherry Huff. So the agreement, it's clear, and they both admitted that she signed everything he wanted, and the agreement was that he would take care of her financially. And the object and purpose was proven because it enabled Anthony Huff to engage in those business operations. Also, with respect to consumer protection, counsel argues that our claim against Mrs. Huff is aiding and abetting, and that is not a claim under the Consumer Protection Act. We didn't argue that, have never argued that. Mrs. Huff, in her own right, with her own affirmative actions, engaged in deceptive conduct, which then follows damages to the plaintiff for... Let me ask you this. Are there any legal issues or principles here that warrant a published decision in this case? Or is this just a really fact-specific situation? I thought about that the other day, and I really don't think there are any that warrant a published decision. I think that, you know, the published or unpublished are quite usable, but I don't see any new law here. It is really a sufficiency question. There's no abuse. There's no reversible error. The damages are not just limited to the tracing, which is, we called it tracing, but it never was tracing. Well, the instruction issue is a little bit unusual, isn't it? During Instruction 30 on the business of insurance? Yes, because, you know, it really is not an instruction that goes to an element of a claim or anything like that. That's true, but it is part of the law. And let me also point out, the defendants... I'm just talking about in terms of, you know, whether it's worthy of publication. Oh. That's all. That could be. That could be. And along those lines, the defendants argued to the court at the time of jury instructions, and the defendants... I'm thinking of another instruction. They argued two things. It was prejudicial. The jury already knew about the crimes. And second, that it didn't go to a claim. Now, if they're now arguing that the court should have instructed the jury to make a finding on the business of insurance and whether Anthony Huff was engaged in the business of insurance, they should have proposed that at the time because the reason we take exceptions and we argue jury instructions is so that the court can formulate at the time. The defendants didn't argue that until their brief on appeal. And I carefully went through the post-verdict motion, and they argued a little more than at the time of jury instructions, and then on appeal they argued even more. So if the standard is formulation of the instruction, the court formulated the instruction. It wasn't an abuse of discretion, and the defendants didn't raise some of the arguments they're raising now. All right. You're out of time. Okay. Thank you very much. Thank you for your argument. Well, I see I only have four minutes to work my magic, so I will make sure I get that done. We're not asking for a finding. We don't want a finding. We don't want anything having to do with the Violent Crime Control Act. We were simply pointing out, Judge, as you were saying, that it's really not tied to any other instruction, and the jury isn't asked to do anything with that. One of the issues I didn't address, but is in the brief, is the bankruptcy issue, and that's a little bit unusual. Here we have the claim that Midwest stole premium money that they had gotten from Certified, which was a bankrupt entity. The bankruptcy trustee owns those claims. It owns all claims to all assets of Certified. The bankruptcy trustee actually came out here to Oregon and put in a $12 million preference claim against all monies that came to Cascade. So we believe that issue is not in front of the district court, but is one reserved for the bankruptcy court. In her argument, Ms. Vreeland said that her name never appeared on the paperwork until after the conviction. That's not correct. Later on, she said that it was there from the beginning, and it was. Ms. Huff's name was on it. Well, on her point, though, on the conviction, that you're saying that the conviction didn't exist, are you saying it didn't? Was she correct in her chronology in terms of that the defendant had pled guilty? Right, but a guilty plea is not a conviction until a judgment of conviction, and the judgment of conviction didn't occur until May of 2004. And if you look at 609A, which is what we're talking about here, impeachment with a conviction, it's not impeachment with a ---- What if you're found guilty by a jury, but you haven't been sentenced yet, so it's not a conviction? I think it's not a conviction because you've always got a motion for a new trial. Well, what about if there's an appeal pending? It's not a conviction? Well, that's not the case here. I don't know the answer to that. I don't know. I know for collateral estoppel purposes, that goes back and forth depending on the circuit you're in. But there's no judgment of conviction here until May of 2004, and that's what, in our view, should have been the guiding principle. As to these inconsistent verdicts, they still don't come up with an explanation. There's no record evidence to justify the no verdict on the misappropriation of premiums and then an $820,000 verdict. The argument she makes really doesn't jive with any standards. Both of these, the predicate act for the criminal profiteering was misappropriation of premiums. There's no logical explanation, and it's clear to me that the verdicts are inconsistent. I just want to close with the Sherry Huff issue, and we've still got to get back to the law, and the law says there has to be an agreement between Ms. Huff as to the purpose of the conspiracy, and there's no proof of that. And the only proof they offer is she got money, he offered to take care of her. It's a little like the case you were listening to before. They never found the body that she's dead, but you can still be prosecuted for murder. So if you're saying that people sign written agreements for a conspiracy, I don't think that that's not what's required, right? I don't think a written agreement's required. I think evidence of an oral agreement or inferences that there was substantial evidence. So as to Cascade, Cascade came about two years after Midwest was formed, and I see I'm over. All right, thank you both for your argument. This is a lot of issues in this case, and I think all of the counsel today did an excellent job in arguing their cases. Thank you. Thank you for the courtesy of your court. Thank you. The court will stand adjourned.
judges: Hug, Tashima, Callahan